UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| ROOSEVELT L. WHITE, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 14-171S |
| | : | |
| CAROLYN W. COLVIN, ACTING | : | |
| COMMISSIONER OF SOCIAL SECURITY, | : | |
| Defendant. | : | |

**REPORT AND RECOMMENDATION**

Patricia A. Sullivan, United States Magistrate Judge

Plaintiff Roosevelt L. White alleges that he has been disabled since 1988 due to serious

mental impairments, including schizophrenia and mild mental retardation exacerbated by

debilitating physical pain in the lumber and cervical spine; he has been incarcerated at the Adult

Correctional Institutions ("ACI") for much of the time since the alleged date of onset.

Complicating his application are ACI treating records establishing that his mental status is

largely normal, his intellectual abilities are average and his back issues are moderate. The matter

is before the Court on his motion for reversal of the decision of the Commissioner of Social

Security (the "Commissioner"), denying Disability Insurance Benefits ("DIB")[1] and

Supplemental Security Income ("SSI") under §§ 205(g) and 1631(c)(3) of the Social Security

Act, 42 U.S.C. §§ 405(g), 1383(c)(3) (the "Act"). He contends that the Administrative Law

Judge ("ALJ") erred in his Step Two finding that mood disorder and antisocial personality

disorder are not severe impairments. Additionally, Plaintiff claims that remand is required based

on the ALJ's failure to discuss the report of the consultative examining psychologist, Dr. John

---

[1] Plaintiff is insured for benefits through December 31, 1995. Tr. 22; see 20 C.F.R. §§ 404.130; 404.131.

Parsons, and his failure to incorporate into his residual functional capacity ("RFC")[2] finding all of the limitations opined to by the medical expert, Dr. John Pella. Defendant Carolyn W. Colvin has filed a motion for an order affirming the Commissioner's decision.

This matter has been referred to me for preliminary review, findings and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Having reviewed the record, I find no material legal error and that the ALJ's findings are adequately supported by substantial evidence. Accordingly, I recommend that Plaintiff's Motion to Reverse without or, Alternatively, with, a Remand for Rehearing of the Commissioner's Final Decision (ECF No. 13) be DENIED and Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 16) be GRANTED.

## I.       **Background Facts**

Plaintiff was twenty-one on the alleged disability onset date of November 1, 1988, Tr. 272, and forty-six on February 20, 2013, the date of the ALJ's decision, Tr. 32, 272. Since he was first incarcerated at the age of nineteen, his intermittent incarcerations have totaled more than twenty-five years in combination; he has never been out of prison for more than seven or eight months at a time. Tr. 80, 86. Plaintiff testified that his most serious crime was robbery, although the record also refers to charges for sexual offenses. Tr. 80, 893. At the time of the hearing on his applications, he said that he had recently been incarcerated again "for arguing with my parole officer." Tr. 80. Apart from these basics, the massive record (well over a thousand pages) associated with Plaintiff's applications is studded with contradictory factual information with respect to most of the relevant background points.

---

[2] Residual functional capacity is "the most you can still do despite your limitations," taking into account "[y]our impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what you can do in a work setting." 20 C.F.R. § 404.1545(a)(1).

To start with, the evidence associated with how far Plaintiff went in school is inconsistent. For example, he told consultative examining psychologist Dr. Parsons that he left school in the sixth grade, Tr. 617, while his applications state that he completed ninth grade, Tr. 326, and there are school records suggesting he at least attended tenth grade. Tr. 371. Similarly, the record reflects employment from 1984-1989, 1994-1995 and in 2002,[3] ranging from handling bulk newspapers, cleaning and warehouse worker, which are all unskilled, to welder and tool and die maker, which are very skilled. Tr. 286-94, 314-15, 319-20, 326. As the vocational expert noted, the skilled work "doesn't seem to match up at all with the rest." Tr. 68-72. Also puzzling is the discrepancy between the applications, filed on July 16, 2010, in which he wrote that he had been married for seven years to "Elizabeth," but the marriage had ended and he had been living with his mother, Mary White, and someone named Bernice Small, Tr. 279-80, and the testimony of his wife, Michelle White, two years later (in August 2012), that they had been married for three years and had lived together, whenever he was not incarcerated, for six years.[4] Tr. 53; see also Tr. 775 (ACI note of June 21, 2011: "Recently married a woman who had a restraining order against him").

The discrepant evidence of Plaintiff's literacy ranges from the observation of consultative examining psychologist Dr. John Parsons that he is "functionally illiterate," Tr. 620, to Plaintiff's coherent and articulate answers on a handwritten report submitted with the application, including, "I read a lot, go to school business class," and listing "reading" as a hobby unaffected

---

[3] A mystery not solved by the record is a reference to $5,953 in self-employment income in 2011. Tr. 46, 294.

[4] The length of Plaintiff's intimate relationship with Michelle White was critical foundational evidence for the ALJ to consider in light of her important testimony at the hearing regarding the profound nature of her husband's cognitive and emotional impairments. Tr. 53-62. In addition, Ms. White participated in the clinical interview that was one of the diagnostic tools relied on by the neuropsychologists who prepared the Tan/Westervelt report. Tr. 760. Their report attributes critical information to her about the longstanding nature of Plaintiff's inability to understand, remember or pay attention. Id. She also appears to have been a source for the conclusion in Dr. Gene Jacobs's psychiatric evaluation that Plaintiff exhibits symptoms of paranoid schizophrenia. Tr. 757.

by his alleged disability. Tr. 337, 342; <u>see also</u> Tr. 338 (function report hand written by Plaintiff: "I . . . take bus to business class, come home watch T.V. w/son and mom, or do some reading"). His testimony that his back pain is so severe that he could not stand during the hearing – "[i]t makes my legs collapse" – may be juxtaposed with the ACI record from March 2010 that, despite back pain, he is able to ambulate well, his handwritten report that regular short walks "to the park or store" are part of his daily routine and the ACI spinal examination report from September 2012 with largely normal findings, resulting in the conclusion of the treating physician that, "I do not feel pt needs narcotic pain meds given my exam today." Tr. 80, 337, 552, 1102; <u>see also</u> Tr. 464 (ACI note of February 11, 2008: "Playing basketball & sports"); Tr. 640 (ACI note of June 3, 2011: "Chronic back pain attributed to HNP L4/5 Better with Naproxen").

To buttress his claim of extremely low cognitive functioning and serious mental illness, at the hearing, Plaintiff's wife testified that he cannot "understand things like a normal person would," needs help dressing, cannot learn even simple chores, follows her around, cannot carry on a conversation, hears voices, suffers from paranoia and anxiety, has no friends and cannot get along with others, cannot be left alone, and cannot attend a movie because he cannot handle the noise and other people. Tr. 54-62; Tr. 747 ("'hes like a big kid' acc to wife"). This testimony is completely inconsistent with the evidence of Plaintiff's competent participation in frequent group therapy sessions at the ACI, which required the ability to function effectively for an extended period (one and a half to two hours) in a group and frequently required the completion of reading and writing assignments. <u>See, e.g.</u>, Tr. 985, 994 (group leader notes that Plaintiff "[c]ompleted assignments in a timely and satisfactory manner," "completed budget handout," "completed worksheets and offered examples to class"). At these group therapy sessions,

Plaintiff exhibited both intellectual and social competencies; group leaders recorded observations at each session, including that he was "engaged," "taking notes," "prepared," "helping others," was good in "[d]isplay[ing] empathy for other group members" and expressing "good ideas and experience about what to put on a resume." E.g., Tr. 920, 987, 988.

Also starkly inconsistent with Ms. White's testimony (and with the conclusions in the Parsons report, the Tan/Westervelt report[5] and Dr. Jacobs's notes[6]) are the medical observations of various ACI psychiatrists. The ACI records from 2011 and 2012 reflect that Plaintiff's intellect is average and that his mental status examinations resulted in largely normal findings. Tr. 647-48, 650, 777, 789-90, 949, 1120. For example, a March 2011 mental status examination was "entirely normal," Tr. 650, while in June 2011, ACI psychiatrist Dr. Natalie Lester performed a mental status examination with all normal findings except for labile mood. Tr. 777. ACI psychiatrist Dr. Martin Bauermeister wrote after a 2012 examination performed because Plaintiff told a social worker that he had been diagnosed with schizophrenia, "history and mental status do not suggest psychotic illness . . . other than drug abuse." Tr. 949. On October 2, 2012, a Global Assessment of Functioning ("GAF")[7] score of 70 was assessed by ACI psychiatrist Dr. Laura Whiteley; this evidences "mild symptoms . . . OR some difficulty in social, occupational,

---

[5] The Tan/Westervelt report was prepared by neuropsychologists, Dr. Jing Ee Tan and Dr. Holly Westervelt, based on a one-time encounter on November 9, 2011. Tr. 760-67. Plaintiff was referred to them for assessment of his cognitive functioning by treating psychiatrist Dr. Gene Jacobs. Tr. 760.

[6] Dr. Gene Jacobs is a psychiatrist who treated Plaintiff from September through December 2011. Tr. 747-57.

[7] The Global Assessment of Functioning ("GAF") scores relevant to this case are in the 61-70 range, which indicate "some difficulty in social, occupational, or school functioning," the 41-50 range, which indicate "serious impairment in social, occupational, or school functioning," and the 31-40 range, which indicate "major impairment in several areas such as work or school, family relations, judgment, thinking, or mood." See Diagnostic and Statistical Manual of Mental Disorders, Text Revision 32-34 (4th ed. 2000) ("DSM-IV-TR"). While use of GAF scores was commonplace at the time of Plaintiff's treatment, "[i]t bears noting that a recent [2013] update of the DSM eliminated the GAF scale because of 'its conceptual lack of clarity . . . and questionable psychometrics in routine practice.'" Santiago v. Comm'r of Soc. Sec., No. 1:13-CV-01216, 2014 WL 903115, at *5 n.6 (N.D. Ohio Mar. 7, 2014) (citing Diagnostic and Statistical Manual of Mental Disorders at 16 (5th ed. 2013) ("DSM-V")).

or school functioning." Tr. 1120; DSM-IV-TR at 34. Yet Dr. Parsons, who saw Plaintiff only once, assessed him in October 2010 and assigned a GAF of 40,[8] evidencing "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood." Tr. 623; DSM-IV-TR at 34.

From the consultant (Dr. Parsons) and treating sources (Drs. Tan, Westervelt and Jacobs) who lack the ACI staff's long-term treating relationship with him, Plaintiff presents with diagnoses of schizoaffective disorder, rule-out paranoid schizophrenia, cognitive disorder not otherwise specified, post-traumatic stress disorder ("PTSD"), mild mental retardation, mood disorder, antisocial personality disorder, alcohol and cocaine dependence in early partial remission and cannabis abuse in early partial remission. Tr. 622, 762-63, 768. The ACI treating notes list diagnoses of alcohol dependence syndrome, cocaine dependence, mood disorder and antisocial personality disorder. Tr. 777, 1000, 1120. For physical impairments, based on a lumbar MRI performed in 2010, Tr. 524, and a cervical MRI performed in 2011, Tr. 906, Plaintiff has established diagnoses of degenerative lumbar disc disease and a moderate disc protrusion in the cervical spine. See also Tr. 1033 (ACI spinal x-ray taken on June 15, 2012, shows "moderate degenerative arthritis").

## II.     Travel of the Case

On July 13, 2010, Plaintiff filed DIB and SSI applications alleging disability since November 1, 1988. Tr. 20, 22. After his applications were denied at the initial and reconsideration stages, Plaintiff requested a *de novo* hearing before an ALJ. Tr. 149. On August 29, 2012, and January 22, 2013, hearings were held; at the first hearing, Plaintiff's wife and mother testified, Dr. John A. Pella testified as the medical expert and Kenneth R. Smith testified as the vocational expert. Tr. 43, 74. At his request, Plaintiff's testimony was postponed because

---

[8] See n.7, *supra*.

he was incarcerated and his attorney received new information that morning that he wished to discuss with him prior to testifying. Tr. 46-47. Still incarcerated, Plaintiff testified by video teleconference at the second hearing. Tr. 76. On February 20, 2013, the ALJ issued his decision. Tr. 17. On April 4, 2013, Plaintiff filed a Request for Review of Hearing Decision/Order with the Appeals Council. Tr. 13. When the Appeals Council denied Plaintiff's request on February 5, 2014, the ALJ's decision became the Commissioner's final decision. Tr. 1. Plaintiff timely initiated this action. 42 U.S.C. § 405(g).

## III.   The ALJ's Decision

At Step One, the ALJ determined that, since the alleged disability onset date in 1988, Plaintiff has not engaged in substantial gainful activity as defined in the Social Security regulations. Tr. 22. At Step Two, the ALJ determined that Plaintiff has the severe impairments of degenerative lumbar disc disease and "a history of polysubstance dependence;" Plaintiff's mood issues were noted but the ALJ indicated that they were to be "discussed in further detail in the body of the decision." Id. At Step Three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals any Listing. See 20 C.F.R. Pt. 404, Subpt. P, App. 1. Next, in reliance on the state agency physicians and psychologist who reviewed the record, the ALJ found that Plaintiff retains the RFC to

> perform light work as defined in 20 CFR [§§] 404.1567(b) and 416.967(b) except that he should limit postural activities to an occasional basis (such as climbing, balancing, kneeling, crouching, crawling and stooping). He can perform simple tasks and tolerate superficial, occasional contact with the general public.

Tr. 23. At Step Four, the ALJ found that Plaintiff has no past relevant work as defined in the regulations. Tr. 30. At Step Five, using the decisional framework limned by the Medical-Vocational Guidelines, the ALJ found that jobs exist that Plaintiff can perform. Tr. 31 (citing 20

C.F.R. Pt. 404, Subpt. P, App. 2). Thus, the ALJ found Plaintiff not disabled between the

alleged disability onset date in 1988 and the date of the ALJ's decision. Tr. 32.

## IV.    Issues Presented

Plaintiff presents three arguments:

1. Substantial evidence does not support the ALJ's Step Two finding that Plaintiff's mood disorder and antisocial personality disorder are not severe impairments.

2. The ALJ erred in failing to discuss or refer to the report of the consultative examining psychologist, Dr. John Parsons.

3. The ALJ erred in failing to incorporate in his RFC the limitations opined to by the testifying medical expert, Dr. John Pella.

## V.    Standard of Review

The Commissioner's findings of fact are conclusive if supported by substantial evidence.

42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – that is, the evidence must do

more than merely create a suspicion of the existence of a fact, and must include such relevant

evidence as a reasonable person would accept as adequate to support the conclusion. Ortiz v.

Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v.

Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); Brown v. Apfel, 71 F.

Supp. 2d 28, 30 (D.R.I. 1999). Once the Court concludes that the decision is supported by

substantial evidence, the Commissioner must be affirmed, even if the Court would have reached

a contrary result as finder of fact. Rodriguez Pagan v. Sec'y of Health & Human Servs., 819

F.2d 1, 3 (1st Cir. 1987); see also Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991);

Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981).

The determination of substantiality is based upon an evaluation of the record as a whole.

Brown, 71 F. Supp. 2d at 30; see also Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d

192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (court also

must consider evidence detracting from evidence on which Commissioner relied).  Thus, the

Court's role in reviewing the Commissioner's decision is limited.  Brown, 71 F. Supp. 2d at 30.

The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of

the Commissioner.  Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148,

153 (1st Cir. 1989)).  "[T]he resolution of conflicts in the evidence is for the Commissioner, not

the courts."  Id. at 31 (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)).  A claimant's

complaints alone cannot provide a basis for entitlement when they are not supported by medical

evidence.  See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986); 20

C.F.R. § 404.1529(a).[9]

 The Court must reverse the ALJ's decision on plenary review, if the ALJ applies

incorrect law, or if the ALJ fails to provide the Court with sufficient reasoning to determine that

the law was applied properly.  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam);

accord Cornelius v. Sullivan, 936 F.2d 1143, 1145-46 (11th Cir. 1991).  Remand is unnecessary

where all of the essential evidence was before the Appeals Council when it denied review, and

the evidence establishes without any doubt that the claimant was disabled.  Seavey v. Barnhart,

276 F.3d 1, 11 (1st Cir. 2001) (citing Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985)).

 The Court may remand a case to the Commissioner for a rehearing under Sentence Four

of 42 U.S.C. § 405(g); under Sentence Six of 42 U.S.C. § 405(g); or under both sentences.

Jackson v. Chater, 99 F.3d 1086, 1097-98 (11th Cir. 1996).

 To remand under Sentence Four, the Court must either find that the Commissioner's

decision is not supported by substantial evidence, or that the Commissioner incorrectly applied

the law relevant to the disability claim.  Seavey, 276 F.3d at 9; accord Brenem v. Harris, 621

---

[9] The SSA has promulgated identical sets of regulations governing eligibility for DIB and SSI.  See McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1120 n.1 (1st Cir. 1986).  For simplicity, I cite to one set only. See id.

F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).  Where the Court cannot discern the basis for the Commissioner's decision, a Sentence Four remand may be appropriate to allow an explanation of the basis for the decision.  Freeman v. Barnhart, 274 F.3d 606, 609-10 (1st Cir. 2001).  On remand under Sentence Four, the ALJ should review the case on a complete record, including any new material evidence.  Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council).  After a Sentence Four remand, the Court enters a final and appealable judgment immediately, and thus loses jurisdiction.  Freeman, 274 F.3d at 610.

In contrast, Sentence Six of 42 U.S.C. § 405(g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

42 U.S.C. § 405(g).  To remand under Sentence Six, the claimant must establish: (1) that there is new, non-cumulative evidence; (2) that the evidence is material, relevant and probative so that there is a reasonable possibility that it would change the administrative result; and (3) there is good cause for failure to submit the evidence at the administrative level.  See Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 139-43 (1st Cir. 1987).

With a Sentence Six remand, the parties must return to the Court after remand to file modified findings of fact.  Jackson, 99 F.3d at 1095 (citing Melkonyan v. Sullivan, 501 U.S. 89, 98 (1991)).  The Court retains jurisdiction pending remand and does not enter a final judgment until after the completion of remand proceedings.  Id.

## VI.    Harmless Error

"A[n] ALJ's error is harmless where it is 'inconsequential to the ultimate nondisability determination.'" Rivera v. Comm'r of Soc. Sec. Admin., No. 12-1479, 2013 WL 4736396, at *11 (D.P.R. Sept. 3. 2013) (quoting Molina v. Astrue, 674 F.3d 1104, 1115 (9th Cir. 2012)).  If the likely outcome on remand is clear and the same as that reached by the ALJ, the error is harmless and the court may uphold the denial of benefits.  Ward v. Apfel, No. 98-168-B, 1999 WL 1995199, at *3 (D. Me. June 2, 1999), aff'd, Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).  Error is not harmless "[w]hen an agency has not considered all relevant factors in taking action, or has provided insufficient explanation for its actions . . ." Lyons ex rel. X.M.K.L. v. Astrue, No. 12-30013, 2012 WL 5899326, at *7 (D. Mass. Nov. 26, 2012) (quoting Seavey, 276 F.3d at 12).  The ALJ has "an obligation to the claimants and to the reviewing court to make full and detailed findings to support his conclusions." Lacroix v. Barnhart, 352 F. Supp. 2d 100, 107 (D. Mass. 2005).  Thus, it is reversible error when the ALJ does not give good reasons for discounting the opinion of the treating physicians, even if the court can find good reasons to discount the opinion.  Sargent v. Astrue, No. 11-220 ML, 2012 WL 5413132, at *9 (D.R.I. Sept. 20, 2012).  Similarly, if the ALJ finds that the claimant is not credible, he must fully explicate his reasons; if he does not, the court must reverse for the failure to comply with Avery, 797 F.2d 19, and SSR 96-7p, 1996 WL 374186 (July 2, 1996).  See Sargent, 2012 WL 5413132, at *12.

## VII.    Disability Determination

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than

twelve months.  42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-1511.

### A.    The Five-Step Evaluation

The ALJ must follow five steps in evaluating a claim of disability.  <u>See</u> 20 C.F.R. § 404.1520.  First, if a claimant is working at a substantial gainful activity, the claimant is not disabled.  20 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments that significantly limit physical or mental ability to do basic work activities, then the claimant does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Appendix 1, the claimant is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent doing past relevant work, the claimant is not disabled.  20 C.F.R. § 404.1520(e)-(f).  Fifth, if a claimant's impairments (considering RFC, age, education and past work) prevent doing other work that exists in the local or national economy, a finding of disabled is warranted.  20 C.F.R. § 404.1520(g).  Significantly, the claimant bears the burden of proof at Steps One through Four, but the Commissioner bears the burden at Step Five.  <u>Wells v. Barnhart</u>, 267 F. Supp. 2d 138, 144 (D. Mass. 2003) (five step process applies to both DIB and SSI claims).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments and must consider any medically severe combination of impairments throughout the disability determination process.  42 U.S.C. § 423(d)(2)(B).  Accordingly, the ALJ must make specific and

well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).

The claimant must prove the existence of a disability on or before the last day of insured status for the purposes of disability benefits. Deblois, 686 F.2d at 79; see 42 U.S.C. §§ 416(i)(3), 423(a), 423(c). If a claimant becomes disabled after loss of insured status, the claim for disability benefits must be denied despite disability. Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

**B.     Evaluation of Mental Illness Claims**

The evaluation of a claim of disability based on mental illness requires use of a psychiatric review technique that assesses impairment in four work-related functions: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). The review technique is used to rate the severity of mental impairments at Steps Two and Three of the sequential evaluation process, and also serves as the backdrop for the more detailed mental RFC assessment at Step Four. See, e.g., Wells v. Colvin, 727 F.3d 1061, 1069 (10th Cir. 2013); SSR 96-8p, 1996 WL 371184 (July 2, 1996). The ALJ must incorporate pertinent findings and conclusions based on the technique into his decision and must include a specific finding as to the degree of limitation in each of the four functional areas. 20 C.F.R. § 404.1520a(e)(4); Carolyn Kubitschek & Jon Dubin, Social Security Disability Law & Procedure in Federal Court § 5:38 (2014).

## VIII. **Application and Analysis**

### A. **Step Two Findings**

Plaintiff asks the Court to remand the case because the ALJ erred at Step Two in failing to find that mood disorder[10] and antisocial personality disorder[11] constitute severe impairments.

Plaintiff bases his critique of the ALJ's Step Two rejection of mood disorder on language in the decision that seems to refer only to the DIB application. It states:

> The record does not support a finding of mood issues because there is no evidence of such dating back prior to his date last insured [1995].

Tr. 22. However, also referring to mood disorder, the ALJ further states, "[t]his is discussed in further detail in the body of the decision." Id. The subsequent analysis of the medical evidence buttressing the ALJ's RFC finding includes many specific references to the symptoms and diagnosis of mood disorder: "mood swings," "thought he was bipolar," "appeared depressed with flat affect," "depression," "happy one minute and angry the next," and medication "prescribed . . . 'to target mood symptoms and hyperarousal.'" Tr. 26. Nevertheless, Plaintiff is right that there is no Step Two discussion of whether mood disorder amounts to a severe impairment for purposes of the SSI application. He contends that substantial evidence in the record establishes that mood disorder constitutes a severe impairment so that this omission is error that merits remand.

Plaintiff's other claim of a Step Two error is based on his assertion that he suffers from antisocial personality disorder and that it is a severe impairment that has significantly limited his ability to perform basic work. Unlike mood disorder, which the ALJ considered, dropped at Step

---

[10] Mood disorders are a variety of depressive illnesses, such as depressive disorder, which is characterized by depressed mood and/or loss of interest or pleasure in life activities, dysthymic disorder, which is characterized by depressed mood most days, and bipolar disorder, which is characterized by cycling episodes of mania and depression. DSM-IV-TR at 349, 369, 376, 382.

[11] "[A]ntisocial Personality Disorder is a pervasive pattern of disregard for, and violation of, the rights of others that begins in childhood or early adolescence and continues into adulthood." DSM-IV-TR at 701.

Two, only to pick it up for extensive discussion in connection with the development of the RFC finding, the diagnosis of antisocial personality disorder is not mentioned at all in the ALJ's decision even though it is unambiguously established by substantial medical evidence. It recurs in the ACI records, consistently appearing on the list of Plaintiff's diagnoses. For example, on June 21, 2011, ACI psychiatrist Dr. Lester performed an "initial psychiatric evaluation" and included it as an operative diagnosis; similarly, in a February 2012 treating note written by ACI psychiatrist Dr. Bauermeister, it is listed as a chronic problem. Tr. 774-77, 947-49. It is mentioned by treating psychiatrist, Dr. Jacobs, who diagnosed it in September 2011. Tr. 757. Despite this evidence buttressing the diagnosis, the ALJ makes no reference to whether it was even considered as potentially causing severe limitations at Step Two. Plaintiff argues that it should have been considered and, if considered, would have been classified as severe; he contends that this omission also amounts to error requiring remand.

Plaintiff's argument founders on the well-settled principle that a claimant cannot demonstrate harmful error at Step Two unless the failure to make severity findings ends the analysis. Courts consistently label such omissions as harmless as long as the ALJ finds some severe impairment so that the analysis continues. Syms v. Astrue, No. 10-cv-499-JD, 2011 WL 4017870, at *1 (D.N.H. Sept. 8, 2011) ("[A]n error at Step Two will result in reversible error only if the ALJ concluded the decision at Step Two, finding no severe impairment.") (collecting cases); Courtemanche v. Astrue, No. 10-427, 2011 WL 3438858, at *15 (D.R.I. July 14, 2011) (Step Two finding that impairment not "severe" irrelevant absent specific showing of functional limitations that the ALJ failed to consider in making RFC finding), adopted by 2011 WL 3431557 (Aug. 4, 2011); Portorreal v. Astrue, No. 07-296, 2008 WL 4681636, at *4 (D.R.I. Sept. 25, 2008) ("Because the ALJ found in [claimant's] favor at Step Two, even if he had erroneously

concluded that some of her other impairments were non-severe, any error was harmless."), adopted by 2008 WL 4681636 (Oct. 21, 2008). Rather, as long as the ALJ's RFC analysis is performed in reliance on the opinions of state agency reviewing experts or treating sources who considered the functional impact of the impairment in question, there is no material error in failing to include it as a severe impairment at Step Two. Evans v. Astrue, No. CA 11-146 S, 2012 WL 4482366, at *4-6 (D.R.I. Aug. 23, 2012) (no error in ignoring diagnosis of antisocial personality disorder at Step Two where ALJ relied on medical expert's testimony regarding limitations it caused); Legere v. Soc. Sec. Admin. Comm'r, Civ. No. 09-413-B-W, 2010 WL 2670830, at *1-3 (D. Me. June 28, 2010) (no error in failing to include personality disorder at Step Two where state agency reviewers considered its effect to formulate opinions used by ALJ to make RFC finding), adopted by 2010 WL 2899472 (July 20, 2010).

In this case, both the ALJ's Step Two findings and his RFC determination were developed with due consideration for the impact on Plaintiff's ability to work as a result of mood disorder and antisocial personality disorder by his reliance on the opinions of state agency physician, Dr. Faigel, and state agency psychologist, Dr. Hahn, to which the ALJ afforded evidentiary weight. Tr. 30. Dr. Faigel explicitly noted the diagnosis of antisocial personality disorder, Tr. 94, 102, yet opined that Plaintiff's only severe impairment was drug/substance addiction disorders. Tr. 95, 103. Dr. Hahn explicitly referenced Plaintiff's "criminal hx including assault and robbery" and evaluated Plaintiff's "mood issues," concluding that they were "mild" and "non-severe," both at the time of her review and as of Plaintiff's date last insured (1995). Tr. 113-14, 118, 126-27. To corroborate these opinions, the ALJ performed a detailed examination of more recent evidence of mental impairment from the ACI records, noting, for example, that severe mental impairment is contradicted by the note of an ACI

psychiatrist in March 2011 that Plaintiff's mental status examination was entirely normal, Tr.

650, and the opinion of the ACI psychiatrist from October 2012 who assigned a GAF score of

70.[12]  Tr. 26, 28-29, 1120.  The ALJ also carefully considered the extensive evidence of

Plaintiff's ability to function well with others as reflected in the detailed reports of the ACI group

therapy sessions.  Tr. 28.  All of the limitations identified by the state agency reviewers were

incorporated into the ALJ's RFC finding.  Tr. 23, 29-30.

Also fatal to Plaintiff's argument is the absence of any competent record establishing that

these state agency reviewers got it wrong.  Put differently, no acceptable medical source has

opined that mood disorder and antisocial personality disorder caused limitations that not only

significantly limited his ability to perform basic work at Step Two but also have caused

limitations whose severity precludes all work at Step Five.  The only RFC opinion contrary to

those of the state agency reviewers came from a social worker, Janis DeNuccio, who not only is

not an acceptable medical source, but who also relied only on the diagnoses of paranoid

schizophrenia and mental retardation for the limitations to which she opined.  Tr. 768-71.  In any

event, the ALJ's decision to afford her opinion little weight based on its complete inconsistency

with the ACI treating records is well supported by substantial evidence and not challenged by

Plaintiff.  Tr. 26-27.  Otherwise, there is nothing establishing that material work-function limits,

or any limits at all, were caused by Plaintiff's mood and antisocial personality.

In sum, the ALJ properly formulated both his Step Two findings and his RFC in reliance

on state reviewing opinions regarding mental functioning, supplemented by medical evidence

consistent with those opinions.  Richards v. Barnhart, No. 04-59-P-C, 2004 WL 2677206, at *3

(D. Me. Nov. 23, 2004) (ALJ entitled to rely on state agency physician's conclusion that

evidence concerning antisocial personality disorder was insufficient to be found to be severe at

---

[12] See n.7, *supra*.

Step Two).  Therefore, his failure overtly to discuss at Step Two the impact of mood disorder after 1995 and the impact of antisocial personality disorder amounts, at worst, to harmless error. With an RFC determination appropriately supported by substantial evidence in the form of state reviewing opinions that took the limitations caused by these impairments into account, remand is not required.  See Gordils v. Sec'y of Health & Human Servs., 921 F.2d 327, 328-29 (1st Cir. 1990); Shaw v. Sec'y of Health & Human Servs., 25 F.3d 1037, at *4 (1st Cir. 1994) (per curiam).

**B.      Evaluation of Dr. Parsons's Report**

Plaintiff claims that the ALJ erred in failing explicitly to discuss the report of consultative examining psychologist Dr. Parsons.

The analysis begins with a close look at the report itself.  On October 13, 2010, shortly after his applications were filed, Plaintiff was referred for a consultative examination; he met with Dr. Parsons for a clinical interview, testing of cognitive and emotional functioning and a mental status examination.  Tr. 615.  The resulting report describes extreme cognitive deficits and serious mental illness.  Tr. 615-23.  Noting Plaintiff's paranoid, slow and awkward behavior, disheveled appearance and neglected hygiene, including "significant body odor," Dr. Parsons found Plaintiff to be so impaired as to be "virtually un-testable;" in reliance on a nonverbal intelligence test, he scored Plaintiff's full scale IQ as 68.  Tr. 616, 619, 621.  Based on the information provided by Plaintiff, including his descriptions of auditory hallucinations, paranoia and obsessive thoughts of violence, coupled with observations made during a mental status examination, Dr. Parsons opined that Plaintiff's "severe" problems had persisted since adolescence; he diagnosed schizoaffective disorder (depressed type), substance abuse and

dependence, cognitive disorder, PTSD, mild mental retardation and antisocial personality disorder.  Tr. 621-22.

Plaintiff is right that the ALJ's decision does not mention Dr. Parsons's work.  However, the ALJ did extensively discuss similarly extreme conclusions found in the opinion of treating social worker Janis DeNuccio, the treating notes of psychiatrist Dr. Jacobs and the cognitive functioning report prepared by the team of neuropsychologists, Drs. Tan and Westervelt.  Tr. 27.

Dr. Jacobs's treating notes are interspersed with those of Ms. DeNuccio; he appears to have seen Plaintiff five times during September through December 2011.  Tr. 747-57.  His psychiatric evaluation, performed on September 22, 2011, is based on a clinical interview of Plaintiff and his wife during which they told him that Plaintiff can barely read, has a history of hearing voices, does not trust people and believes that people are always talking about him.  Tr. 757.  His report lists diagnoses of rule-out paranoid schizophrenia, cognitive disorder and antisocial personality disorder; it assesses a GAF score of 45.[13]  Id.  Like Dr. Parsons, Dr. Jacobs noted that Plaintiff's impairments are so severe that he could not complete testing; as a result, Dr. Jacobs referred Plaintiff to Drs. Tan and Westervelt for an assessment of cognitive functioning. Tr. 752.  They saw him on November 9, 2011, and found "general intellectual functioning" to be "extremely low," with an IQ of 61.  Tr. 760-67.  Dr. Jacobs also appears to have referred Plaintiff for therapy to Ms. DeNuccio; she saw him four times between September and December 2011.  Tr. 748, 751, 753, 755.  Presumably based on Dr. Jacobs's psychiatric evaluation and the Tan/Westervelt report, on January 19, 2012, she opined to a diagnosis of "r/o paranoid schizophrenia," as well as to the inability to focus or concentrate, limited cognitive

---

[13] See n.7, *supra*.

functioning and severe functional limitations in every sphere, including performing even simple tasks.  Tr. 768-71.

The ALJ rejected both the DeNuccio opinion and the Tan/Westervelt conclusions as totally inconsistent with the rest of the treating medical evidence.[14]  He focused on Plaintiff's treating records, principally from the ACI, as the "best evidence of the claimant's mental status . . . accord[ing] greatest weight to this evidence;" he found that these records demonstrate that Plaintiff "attempted to present himself as far more limited than he actually is" in his interaction with providers like the neuropsychologists and the social worker whose opinions would become evidence in connection with his disability applications.  Tr. 29.  To buttress this conclusion, the ALJ provided a detailed and specific survey of the extensive evidence from the ACI.  For example he focused on the ACI group therapy notes that describe Plaintiff as "demonstrat[ing] many skills during these sessions that he did not appear to have during his neuropsychological evaluation," including the ability to participate effectively in group discussions, to provide feedback with good ideas, to express empathy for others, to demonstrate understanding of material presented, to prepare written assignments, to watch and discuss movies, to take notes, to read a Newsweek article and demonstrate understanding of the topic, to maintain a clean and neat appearance and consistently to exhibit normal behavior and speech.  Tr. 27-28.  The ALJ also focused on the treating opinions of the several ACI psychiatrists who uniformly opined that Plaintiff did not suffer from serious mental impairments.  See, e.g., Tr. 26 (referencing psychiatrist note that mental status examination entirely normal), Tr. 28-29 (referencing

---

[14] Dr. Jacobs did not submit a medical opinion.

psychiatric opinion that Plaintiff shows no signs of psychosis, his appearance is appropriate, mood euthymic, intellect average, with GAF of 70).[15]

Plaintiff contends that this decisional approach is flawed because the failure to discuss Dr. Parsons's report is a breach of the ALJ's duty to evaluate every medical opinion received. 20 C.F.R. § 404.1527(c) ("[r]egardless of its source, we will evaluate every medical opinion we receive.").  Focusing on Dr. Parsons's opinion that Plaintiff is mildly mentally retarded and has suffered from the same problems since adolescence, coupled with Plaintiff's severe disc disease, Plaintiff contends that the case must be remanded for consideration of Listing 12.05C, which mandates a finding of disability for an individual with a full scale IQ of 60 through 70, which has persisted since at least the age of 22, and with at least one other "physical or other mental impairment imposing an additional and significant work-related limitation of function."  Listing 12.05C, 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05; see Nieves v. Sec'y of Health & Human Servs., 775 F.2d 12, 13-14 (1st Cir. 1985) (when claimant has IQ below 70 and another severe impairment, finding of disability compelled).

The Commissioner argues[16] that the ALJ's decision makes clear that a remand solely to require the ALJ to consider and discuss Dr. Parsons's report is contrary to the common-sense proposition that remand should not be ordered when the ignored opinion is "not significantly

---

[15] See n.7, *supra*.

[16] The Commissioner's riposte also contends that Dr. Parsons's report does not constitute a "medical opinion," as the term is used in 20 C.F.R. § 404.1527(c), so that the ALJ was not required to "evaluate" it to determine Plaintiff's impairments and limitations.  Id.  I decline to rule in favor of the Commissioner on this ground, as Dr. Parsons wrote a detailed report that explained his testing of Plaintiff's cognitive functions, along with several diagnoses and a GAF score.  Tr. 615-23; see 20 C.F.R. § 404.1527(a)(2) ("medical opinion" is defined as "statements . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions").  This is sufficient to constitute a medical opinion.  See Smith v. Colvin, No. 4:12-CV-03588-DCN, 2014 WL 1159056, at *3 (D.S.C. Mar. 20, 2014) (diagnoses with GAF score is medical opinion); Nguyen v. Astrue, No. C-10-4807 JCS, 2012 WL 2119151, at *19 (N.D. Cal. June 11, 2012) ("Defendant's argument that a doctor's diagnosis is not a medical opinion is not supported by authority. The Court is not persuaded that a doctor must offer an opinion as to how a claimant's medical impairment would impact their ability to function in a work setting.").

more favorable" than an opinion that the ALJ did discuss.  LaFlamme v. Colvin, No. 1:14-cv-57-DBH, 2015 WL 519422, at *6 (D. Me. Feb. 6, 2015) (citing Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010)).  I find that the ALJ's lengthy and thoughtful discussion of the Tan/Westervelt report and the DeNuccio opinion is more than sufficient to demonstrate that remand would be an empty exercise.  Ward, 211 F.3d at 656; see N.L.R.B. v. Beverly Enters.-Mass, 174 F.3d 13, 26 (1st Cir. 1999) ("ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party").  On the data point deemed pivotal by Plaintiff, the IQ score in the range of mild mental retardation, Drs. Tan and Westervelt assessed an IQ score of 61, Tr. 767, even lower than the IQ of 68 assessed by Dr. Parsons.  Tr. 619.  Indeed, apart from their disagreement with Dr. Jacobs's diagnosis of paranoid schizophrenia, which aligns with Dr. Parsons's diagnosis of schizoaffective disorder, Drs. Tan and Westervelt made findings very similar to those of Dr. Parsons, including "extremely low general intellectual functioning and deficiency in most cognitive areas." Tr. 762.  With the ALJ's rejection of the Tan/Westervelt IQ finding well-grounded in substantial evidence,[17] and not challenged by Plaintiff, remand is not warranted to compel the ALJ to repeat the same findings based on Dr. Parsons's report.  Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires [a court] to remand a case in quest of a perfect [ALJ] opinion unless there is reason to believe that the remand might lead to a different result.").

---

[17] When substantial evidence supports an ALJ's rejection of IQ scores purporting to establish mild mental retardation, there is no error in the finding that Listing 12.05C is not met.  Chunn v. Barnhart, 397 F.3d 667, 672 (8th Cir. 2005) ("An ALJ may reject IQ scores that are inconsistent with a claimant's daily activities and behavior, especially when the scores are based on a one time examination by a nontreating psychologist."); Bard v. Astrue, No. 1:10-cv-220-JAW, 2011 WL 2559534, at *4 (D. Me. June 27, 2011) (ALJ may reject IQ test when record establishes that score is inconsistent with claimant's prior educational or work history, daily activities, behavior, or other aspects of life), adopted by 2011 WL 2791082 (July 15, 2011).

Whether or not the Parsons report was "evaluated" by the ALJ, the ALJ did not commit reversible error in the treatment of it in his decision. I do not recommend remand based on the ALJ's failure to discuss Dr. Parsons's report.

### C. Consideration of Dr. Pella's Medical Opinion

In this case the ALJ procured a medical opinion from an expert, Dr. John Pella, who was a witness at the first hearing. In his opinion, Dr. Pella testified that Plaintiff's RFC is restricted in that he cannot engage in continuous overhead reaching or pushing/pulling with the upper extremities because of moderate disc protrusion in the cervical spine. Tr. 66, 72. Plaintiff contends that the ALJ's failure even to evaluate Dr. Pella's medical opinion in his decision, which is contrary to the applicable regulations and resulted in the omission of this limitation from the RFC analysis, amounts to error requiring remand. See 20 C.F.R. § 404.1527(c) (ALJ is required to evaluate every medical opinion received).

Plaintiff is correct that the ALJ did not mention Dr. Pella's opinion in the decision and did not include any limits on overhead reaching, pushing or pulling in his RFC. Dr. Pella also opined that Plaintiff cannot do repetitive forward bending because of his lumbar spine issues; doubtless because state agency reviewer Dr. Turner opined to the same limitation, the ALJ did incorporate this limitation into his RFC by providing that Plaintiff can only engage on an occasional basis in "postural activities" such as kneeling, crouching, crawling and stooping. Tr. 23, 72, 94, 113, 116-17. Nevertheless, the RFC is silent on the functional limitations caused by the degeneration in Plaintiff's cervical spine. Assuming this to be error, the issue for this Court is whether the error inflicted harm in that the incomplete RFC led to an incorrect finding of available work at Step Five.

The ALJ's Step Five determination is based on consideration of the RFC in the context of the decisional framework established by the Medical-Vocational Guidelines and related rulings, instead of a hypothetical posed to the vocational expert. Tr. 31. Using this framework, the RFC finding – that Plaintiff is capable of exertionally light work, with postural and non-exertional limits – alternatively permits a finding of no disability based on the ability to perform less-demanding, exertionally sedentary work. See 20 C.F.R. § 404.1567(a)-(b). Because Social Security Ruling 96-9p provides that "[l]imitations or restrictions on the ability to push or pull will generally have little effect on the unskilled sedentary occupational base," 1996 WL 374185, at *6 (July 2, 1996), the addition of this limitation does not affect the ultimate outcome. The Medical-Vocational Guidelines still direct a finding of non-disability in light of Plaintiff's age, ability to communicate in English and limited education. See 20 C.F.R. Part 404, Subpt. P, App. 2 § 201.18; see Falcon-Cartagena v. Comm'r of Soc. Sec., 21 F. App'x 11, 13-14 (1st Cir. 2001) (per curiam) (inability to do constant overhead reaching has only marginal effect on occupational base available to individual with ability to do sedentary work; finding of no disability based on application of Medical-Vocational Guidelines affirmed); Garvin v. Barnhart, 254 F. Supp. 2d 404, 410-11 (S.D.N.Y. 2003) (same).

Based on the foregoing, I find that the ALJ's error in failing to evaluate Dr. Pella's medical opinion is harmless – if Dr. Pella's finding that Plaintiff cannot do overhead work or push/pull on a continuous basis had been built into the RFC, the Medical-Vocational Guidelines still support a finding that Plaintiff is not disabled at Step Five based on his capacity to do sedentary work. Under such circumstances, this Court must abide by the cases holding that when error is "inconsequential to the ultimate nondisability determination," and the likely outcome on remand is clear and the same as the ALJ's decision, the Commissioner's

determination of no disabilty should be affirmed.  <u>Ward</u>, 211 F.3d at 656; <u>Rivera</u>, 2013 WL 4736396, at *11; <u>see</u> <u>Fisher</u>, 869 F.2d at 1057.  Accordingly, I do not recommend remand on this ground.

## IX.    <u>Conclusion</u>

I recommend that Plaintiff's Motion to Reverse without or, Alternatively, with, a Remand for Rehearing of the Commissioner's Final Decision (ECF No. 13) be DENIED and Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 16) be GRANTED.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting party.  <u>See</u> Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision.  <u>See</u> <u>United States v. Lugo Guerrero</u>, 524 F.3d 5, 14 (1st Cir. 2008); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603, 605 (1st Cir. 1980).


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
July 24, 2015